# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO.  RWT-08-367** |
| | : | |
| **DENNIS EGBERT BURKE,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## MEMORANDUM OPINION

In *United States v. Hassan El*, the defendant sought to suppress evidence recovered during a valid traffic stop, arguing that the police "used the minor traffic violation (failing to stop at stop sign) . . . as a pretext to conduct a stop of the [car] and to search, without justification, for more serious criminal activity." 5 F.3d 726, 729 (4th Cir. 1993). He claimed that the "true motivation for stopping the car was [an] unsubstantiated hunch that the passengers were involved in some sort of criminal activity or that the car had been stolen." *Id.* The Fourth Circuit rejected Hassan El's claims, holding that when an officer observes a traffic offense and thus has probable cause to stop a vehicle, the seizure is reasonable regardless of whether the traffic violation is being used as a "pretext" to investigate "intuitive suspicions" of unrelated criminal activity. *Id.* at 730. Three years later, in *United States v. Whren*, the Supreme Court endorsed this result, holding that the reasonableness of a traffic stop does not depend on whether or not the stop is pretextual, because "subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." 517 U.S. 806, 813 (1996).

This case presents a slight, but critical variation on the scenario in *Hassan El* and *Whren*. The issue before the Court today is whether a traffic stop that is clearly pretext for investigation

of unrelated criminal activity may still be upheld as reasonable under the Fourth Amendment when the Government fails to meet its burden of demonstrating probable cause for the pretext. The Court concludes that it may not, and therefore will GRANT the Defendant's motions to suppress.

## I. PROCEDURAL HISTORY

The Defendant, a lawful permanent resident of the United States, has been charged by indictment with one count of making a false statement in an application for a passport in violation of 18 U.S.C. § 1542; two counts of falsely and wilfully representing oneself to be a citizen of the United States in violation of 18 U.S.C. § 911; and one count of identity theft in violation of 18 U.S.C. § 1028A(a)(1). The Defendant was arraigned on August 26, 2008 and has entered pleas of not guilty on all counts. The Defendant filed motions to suppress all tangible and derivative evidence and statements stemming from an allegedly illegal traffic stop on October 19, 2005 in Baltimore, Maryland. [Paper Nos. 11 & 13].

The Court held an evidentiary hearing on the pending motions on November 25, 2008. At that hearing, the Government's witnesses were unable to articulate their specific basis for believing that there was probable cause to stop Defendant's car for a traffic infraction.  Upon the conclusion of the hearing, at the parties' request, the Court permitted supplemental briefing on the limited issue of the validity of the traffic stop. The Court then conducted a second hearing in this matter on February 19, 2009, to hear argument on the motions in light of the additional round of briefing.

## II. FINDINGS OF FACT

Prior to the date of the traffic stop at issue in this case, a confidential source (CS) informed Immigration and Customs Enforcement (ICE) agents that a Jamaican man known as "Blessid" was involved with an organization smuggling cocaine through Baltimore-Washington International (BWI) airport.  The CS provided a physical description of Blessid and advised he was living at 3120 Saint Paul Street, Baltimore, Maryland. The CS also identified a vehicle or vehicles used by Blessid. The agents ran a DMV database search on the license plate number of one of the specified vehicles, and discovered it was registered to "Paula Davis" at an address in Silver Spring, Maryland.  ICE agents then ran a search of the address associated with the vehicle through the ICE database, and learned that Paul Davis, an ICE fugitive, was living at that address.  According to the ICE database, Paul Davis was a Jamaican national with a history of smuggling cocaine into the United States.

Based on this information, ICE agents then set up surveillance at 3120 Saint Paul Street on October 19, 2005. At some point that evening, ICE agents observed the Defendant, who matched the CS's description of Blessid, enter one of the vehicles identified by the CS.  Agents suspected that the Defendant was the fugitive Paul Davis, and/or Blessid. ICE Special Agent Willie Crump then contacted Baltimore police officer Konstantine Passamichalis, who in turn instructed officer Timothy Blasko, also of the Baltimore Police Department, to follow the vehicle and pull it over if he observed a traffic infraction. (Transcript of Evidentiary Hearing held November 25, 2008, at 108)(hereinafter, "Hr'g Tr.").

Shortly thereafter, Officer Blasko stopped Defendant's car. Defendant presented a Washington, D.C. driver's license bearing the name John Marque Pollard.  The license listed the

individual's height and weight as 5'6" and 165 pounds, which matched the physical appearance of the Defendant.  At some point after the stop, Officer Passamichalis arrived on the scene and requested that dispatch perform a criminal history check on John Marque Pollard.[1]  This information indicated that Pollard was 6'3" and 230 pounds.

Armed with this inconsistency, Agent Crump, who arrived after the traffic stop, approached Defendant and told him they believed he was Paul Davis, a Jamaican wanted for cocaine smuggling. (Hr'g. Tr. 23, 29). Defendant adamantly denied being Paul Davis, and a search of his vehicle did not turn up anything incriminating. Agent Crump contends that he then told the Defendant he was free to go and was not detained in any way, but that Burke voluntarily consented to accompany Agent Crump to the ICE offices to prove that he was not Paul Davis. The entire stop lasted approximately ten to fifteen minutes. (Hr'g Tr. 31). Defendant was never issued a traffic citation for speeding or any other violation. Defendant was then transported in Agent Crump's car to the ICE offices where he was fingerprinted.

Defendant testified that he was handcuffed at the scene of the traffic stop and did not feel free to leave.  He stated that when Agent Crump asked him whether he would come with him to get fingerprinted, he stated he did not want to go. (Hr'g Tr. 143). At the time, Defendant was aware that he was wanted on a pending murder charge in West Virginia and that he was using a driver's license issued under someone else's name.  He testified that he did not want to go with the officers because "I knew if I went to take my fingerprints, they would know exactly who I

---

[1] It is unclear from the record whether the record requested for John Marque Pollard was a criminal history (NCIC) record, or a driving record. Agent Crump testified that a "criminal record check" was performed (Hr'g Tr. 28); Det. Passamichalis testified that he performed a traffic check, but not a criminal record check (Hr'g Tr. 114, 116, 118).  For the purposes of this motion, it is a distinction without a difference.

was," and he feared they would discover this incriminating information about him. (Hr'g Tr. 143, 147).

The testimony also differs on what happened when the Defendant arrived at the ICE office.  Mr. Burke contends he was placed in a holding cell that was locked from the outside while the agents waited for the results of his fingerprinting. Had he been free to leave, Defendant stated that "I would have left. That's all I wanted to do." (Hr'g Tr. 147). In contrast, Agent Crump testified that after Davis submitted his fingerprints, he was free to roam about the office, make telephone calls, drink water and use the restroom facilities.

Ultimately, Defendant's fingerprint analysis revealed that he was Dennis Egbert Burke, and that there was an outstanding warrant for his arrest for a murder in West Virginia.

## III. ANALYSIS

When a consensual search is preceded by a Fourth Amendment violation, the government must prove not only the voluntariness of the consent under the totality of the circumstances, *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), but also must "establish a break in the causal connection between the illegality and the evidence thereby obtained" so that the consent cannot be considered an exploitation of the illegal act. *United States v. Melendez-Garcia*, 28 F.3d 1046, 1053 (10th Cir. 1994) (quoting *United States v. Recalde*, 761 F.2d 1448 (10th Cir. 1985); 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.2(d) (4th ed. 2004). Thus, if relying on consent to justify a search or seizure, "the government has a heavier burden to carry when the consent follows an illegal stop." *Melendez*, 28 F.3d at 1054. The two requirements (voluntariness and exploitation) will often overlap to a considerable degree, but

they address separate constitutional values and they are not always coterminous. *Id.* "In short, there is an exclusionary purpose as well as a fairness purpose in depriving police of the fruit of an illegal arrest or search." *Id.* at 1055.

### A. Government Has Failed to Show Probable Cause for Traffic Stop

When police stop a vehicle, they conduct a seizure within the meaning of the Fourth Amendment, and that seizure must be reasonable. *See Whren v. United States*, 517 U.S. 806 (1996). Regardless of the officers' subjective intentions, the decision to stop a vehicle is reasonable if the police had "probable cause to believe that a traffic violation has occurred." *Id.* at 810. In *United States v. Hassan El*, the Fourth Circuit held that a traffic stop does not violate the Fourth Amendment when police officers use an observed traffic violation as "pretext" for stopping a vehicle, "regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity." 5 F.3d 726, 730 (4th Cir. 1993). The Government bears the burden of establishing by a preponderance of the evidence that the police had probable cause to effect a traffic stop. *See United States v. Basinkski*, 226 F.3d 829, 833 (7th Cir. 2000); *United States v. Murphy*, 402 F. Supp. 2d 561, 565 (W.D. Pa. 2005). It is clear to the Court that the true motivation behind the traffic stop of the Defendant on October 19, 2005, was the Customs Agents' suspicion that the Defendant was the fugitive Paul Davis, and they wished to stop him to investigate his identity. There is nothing wrong with that under *Whren* and *Hassan El*, and this pretextual stop would have been reasonable under the Fourth Amendment, *if* police had been able to demonstrate probable cause to believe the Defendant had committed a traffic violation. In this case, however, the

Government has failed to meet that burden, and instead asks the Court essentially to uphold a pretextual stop without the pretext – in reality, nothing more than an investigatory stop unjustified by reasonable, articulable suspicion of criminal activity.

The evidence at the hearing established that Detective Blasko did not remember the basis for the traffic stop, and there were no contemporaneous documents created that memorialized the reason why Defendant's car was stopped.  The best that Det. Blasko could do was make a blanket statement that his regular practice when following a suspicious vehicle was to wait until the vehicle committed a traffic violation, and that he never pulled vehicles over without probable cause.  Essentially, Det. Blasko was asking the Court to simply "trust him" and take him at his word that he would not have stopped the car if he had not observed a traffic violation. This is simply an insufficient legal basis upon which to uphold a traffic stop.  A finding of probable cause must be based on articulated facts supporting that conclusion.

Agent Crump, who arrived after the traffic stop had occurred, testified: "From the information I received, [the Defendant] was stopped for speeding." (Hr'g Tr. 26). Agent Crump never identified the source of this information, and the first time he ever mentioned speeding in connection with this case was nearly *three years after the stop*, on July 30, 2008, when he drafted – from memory  – his affidavit in support of the criminal complaint in this case. (Def. Ex. 4).  There was no testimony as to how fast Defendant's car was allegedly going, what the posted speed limit was, or how the speeding was determined (pace, radar, direct observation, etc.).

Further compounding the Court's quandary, the evidence that *was* presented was rife with inconsistencies and leaps of logic. First, witnesses contradicted one another as to the location and time of the stop. In Agent Crump's affidavit for the criminal complaint in this case, he stated

that Defendant's car was stopped at Saint Paul and North Avenue. (Def. Ex. 4, ¶ 4). However, Detective Passamichalis testified that the car was stopped in the 2500 block of North Calvert Street (Hr'g Tr. 107-08), and the towing report for Defendant's vehicle states that the offense occurred at 2400 Calvert Street, which is approximately six or seven blocks away from the intersection of Saint Paul and North Avenue.  (Hr'g Tr. 58-59 & Def. Ex. 9). As for the exact time Defendant's car was stopped, Agent Crump's incident report says 8:20 p.m., but he testified at the hearing that it was actually around ten o'clock. (Def. Ex. 5; Hr'g Tr. 17). As if to split the difference, Agent Crump's affidavit, written in July 2008, states the incident occurred at approximately 2100 hours, or 9:00 p.m. (Def. Ex. 4, ¶ 4).  The tow report for Defendant's vehicle lists the incident time as 10:00 p.m. (Def. Ex. 8).

The documentation of the traffic stop is similarly lacking in reliability.  Crump testified that he prepared the incident report the night of the stop, going over into the early hours of the next morning, and it bears the date of October *16, 2007*, when the incident actually occurred on October *19, 2005.* (Def. Ex. 5). Crump explained that error entering the day was his mistake, while the error in the year was the result of a computer problem. (Hr'g Tr. 42).  This report states only that the Baltimore City Police Department conducted a traffic stop, but does not state any basis for the stop. Nearly three years after the stop, on July 30, 2008, Agent Crump prepared an affidavit–admittedly from memory (Hr'g Tr. 57)–in support of the criminal complaint in this case.  In it, Crump states that Defendant was stopped for speeding (but not by him). This is the first mention of speeding in any document related to the stop.

A number of other courts, when faced with similar evidentiary records, have found that the Government failed to meet its burden of proof with regard to demonstrating probable cause

for the stop. For example, in *United States v. Murphy*, 409 F. Supp. 2d 561 (W.D. Pa. 2005), the court held that the government had not shown by a preponderance of the evidence that the defendant ran a red light, and therefore, it had not carried its burden of demonstrating probable cause for a traffic stop.  The court noted several inconsistencies within the testimony and evidence offered by the government, including the fact that the arrest report from that evening made no mention of running a red light, the purported basis of the stop. *Id.* at 569.  One officer was found less than credible because he "had a great deal of difficulty recalling anything but the most general details regarding the evening in question." *Id.* at 570. Conversely, the court found the defendant's testimony believable "for the most part,"[2] particularly his version of the events surrounding the alleged traffic violation. *Id.* The court found the testimony of a second officer to be more credible than the first, to the extent that his recollection of the night's events was stronger and more authoritative.  However, the testimony of the second officer was inconsistent with several other witnesses in material respects.  Most importantly, he was the only officer to state that defendant drove "erratically" after running the red light, weaving in and out of traffic. *See also, e.g., United States v. Means*, 351 F. Supp. 2d 852, 854-58 (E.D. Wis. 2004) (finding government had not proven by preponderance that failure to stop at stop sign was reason for traffic stop when defendant's account was credible and officers' actions were more consistent with a conclusion they had been looking for specific motorist and/or vehicle).

Similarly, in *United States v. Morse*, 2008 WL 1751382 (E.D. Wis. 2008), the court found that the government had not met its burden of demonstrating probable cause for a traffic

---

[2] The court noted that the defendant's explanation of the $1,000 cash he was carrying at the time of the stop as proceeds from his landscaping business was suspicious, but did not bear on the issue of the validity of the traffic stop. *Id.* at 570 n.7.

stop, even though two officers testified they had *directly observed* the defendant drive through a
red light. The defendant testified that he had seen the unmarked police car make a U-turn to
begin following him, and that he stopped at the red light immediately before he was pulled over.
*Id.* at *3. The court found that the defendant was equally as credible as the officers. The court
also noted that the defendant received no citation for a traffic violation, and that there is no
mention of the alleged violation in the incident report, which significantly undercut the officers'
testimony. *Id.* at *5. The officers' explanation that they did not issue a citation because the
defendant was cooperative and they had "bigger fish to fry" did not ease the court's concern. *Id.*
Under the totality of the circumstances, the court concluded that the government had not shown
that it was more likely than not that the defendant had run the red light. *Id.*

The evidence in this case is not sufficient to establish probable cause for the traffic stop.
As in *Murphy* and *Morse*, there is no contemporaneous record of the basis for the stop. There
are serious inconsistencies in the record as to facts as fundamental as the time and location of the
stop. Notably, in both *Murphy* and *Morse*, the government presented law enforcement witnesses
who testified to their *direct observations* of a traffic violation, and the evidence was still found
wanting. Here, the Court does not even have that. The Court has been presented with nothing
more than an officer who states "there must have been a violation because I pulled him over,"
and an Agent who appears to remember for the first time three years after the incident that an
unnamed person told him the car was stopped for speeding. This is woefully inadequate, and
does not come close to establishing a basis for this Court to find, by a preponderance of the
evidence, that the stop was supported by probable cause. *See Rivera v. Murphy*, 979 F.2d 259,
263-64 (D. Mass. 1992)(finding no probable cause for arrest when officer set forth no facts, but

only made subjective and conclusory statement that based on his "observations, training, and experience" he had witnessed a drug transaction).

Therefore, the Court must conclude that the traffic stop was an unlawful seizure in violation of the Fourth Amendment.

### B. Independent Source Exception to the Exclusionary Rule Does Not Apply

In *Nix v. Williams*, the Supreme Court described why an exception to the exclusionary rule exists when the police are able to come by the incriminating evidence via a source independent of the constitutional violation:

> [T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse,* position than they would have been in if no police error or misconduct had occurred.  When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position that they would have been in absent any error or violation.

467 U.S. 431, 443 (1984). The independent source must be "*wholly independent*," however. *Id.* For example, in *United States v. Mowatt*, the Fourth Circuit excluded evidence seized pursuant to a warrant because the officer would not have sought a search warrant for defendant's apartment but for observations made as a result of an unlawful entry.  The court held that the evidence recovered from a later search is not admissible unless the government establishes that "no information gained from the illegal [search] affected either the law enforcement officer's decision to seek a warrant or the magistrate's decision to grant it." *United States v. Mowatt*, 513 F.3d 395 (4th Cir. 2008) (quoting *Murray v. United States*, 487 U.S. 533, 540 (1988)).

Here, all the evidence that resulted in Defendant's arrest in this case flowed directly from the illegal traffic stop.  Had the Fourth Amendment violation not occurred, the police would *not* have been in the same position. The Agents would have had no opportunity to speak with the Defendant or view his driver's license that evening had Officer Blasko not stopped his car. Thus, the independent source doctrine is not applicable to the facts of this case.

### C. Taint of Illegal Seizure Was Not Attenuated

Next, the Government argues that even if the traffic stop was illegal, the evidence is still admissible because Defendant's voluntary consent to accompany ICE agents and give his fingerprints is an intervening circumstance that purges the taint of the Fourth Amendment violation.

One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).  However, if the Government has committed a constitutional violation, evidence obtained as a result of the violation cannot be used unless the connection between the unlawful conduct and the acquisition of the evidence has become so attenuated as to dissipate the taint.  Therefore, assuming that the Defendant did consent to continue speaking with officers and to be fingerprinted, this Court must determine whether the taint arising from the illegal traffic stop was sufficiently attenuated by that consent.

*1. Whether Defendant Consented As A Matter of Fact*

As an initial matter, based on the testimony presented, the Court has serious doubts as to whether the Defendant consented to go to the ICE office at all.  On this record, the Court simply cannot conclude by a preponderance of the evidence that the Defendant, if truly given the choice of simply going on his way, would have cheerfully agreed to accompany Agent Crump, in the agent's car, to the ICE office for the explicit purpose of a deeper investigation into his identity—an identity that, once known, would have resulted in his arrest on a murder charge.

The record as to what transpired between the traffic stop and the Defendant's transport to the ICE office is as murky as the testimony was on the basis for the stop.  The Defendant testified that an officer with his gun out told him to "get the F out of the car." (Hr'g Tr. 141).  According to the Defendant, another officer put him up against the car and handcuffed him, and he remained handcuffed when he was driven to the ICE office in the back of Agent Crump's car. (Hr'g Tr. 143).  Burke testified that Crump did ask him if he would "mind going down and getting my fingerprints," but that he said no, because he was aware he had pending charges and that he was using a driver's license that wasn't really his. (Hr'g Tr. 142-43).

Not surprisingly, the law enforcement officers' testimony is quite different. Crump, Blasko, and Passamichalis all testified that no guns were drawn during the stop and that Defendant was not handcuffed at the scene.  Crump testified that at the conclusion of the traffic stop, he informed Burke that he was free to go, but asked him if he would "come back with us to our office so that we could prove that he was not Paul Davis," and that the Defendant indicated he was willing to have his fingerprints taken. (Hr'g Tr. 31-33).  However, one must question, if the trip to the ICE office was truly voluntary, why the Defendant did not drive his own car, but

rather was transported in the back seat of Agent Crump's car while his own vehicle was left behind to be towed away by the police.

When weighing the credibility of the witnesses in this case, the Court notes that in addition to the myriad of inconsistencies in Agent Crump's testimony highlighted earlier in this opinion, the record is also unclear as to whether Burke was in custody when the request to give his fingerprints was posed. Agent Crump testified at the hearing that the Baltimore police appeared to be already searching the vehicle when he arrived on the scene, but his affidavit states that *he* "asked for permission to search his vehicle" upon arrival. (Def. Ex. 4, ¶ 4).  In addition, Crump testified that he indicated to Burke that he was free to leave and was not in any way under arrest, (Hr'g Tr. 29), but in his affidavit he states that while still at the scene of the traffic stop, "the affiant read BURKE his Miranda Rights." (Def. Ex. 4, ¶ 5).

Although the Defendant is far from a perfect witness, having admitted to lying about his identity and evading law enforcement for many years, the Court finds that his account of events is at least partially credible.  First, while for the police officers this was but one of the hundreds of traffic stops they conduct each year, for the Defendant, this was a defining moment, one that led to his prosecution on the outstanding West Virginia charge and his continuing detention.  The evening of October 19, 2005, effectively ended the Defendant's life in this country, as he will ultimately be deported. The Defendant is therefore more likely to correctly remember details of that evening because it was of such greater significance to him personally.  Next, it simply strains credulity to believe that if Burke was informed that he was free to go, he would not have jumped at the chance and disappeared into the sunset.  Any sane person in his position would have tried to distance himself from immigration and police officials as much as humanly

possible. It is also more than a little difficult to accept the proposition that Defendant

"voluntarily" went with Agent Crump in Crump's car, willingly leaving his car behind ultimately

to be towed by police.  A finding of consent would be far easier to reach if Defendant had driven

his own car to the ICE office. *See United States v. Boone*, 245 F.3d 352, 363 (4th Cir. 2001)

(finding that consent to search home was voluntary when defendant drove his own vehicle from

scene of traffic stop back to his residence).

When the Government relies on consent to justify a search or seizure, it must prove by a

preponderance of the evidence that the individual did, in fact, consent. In this case, the Court

finds that the Government has not done so.  That alone would require suppression of all the

evidence in this case.  However, even if the Court were to conclude that Defendant did consent,

that consent would not be a sufficient basis for the Court to admit the evidence in this case, for

the reasons below.

2. *Voluntariness Inquiry*

Several courts of appeals, including the Fourth Circuit, have held that consent can be

voluntary even if it is procured during an illegal detention, provided that the totality of the

circumstances confirms that the consent was not coerced. *See Boone*, 245 F.3d at 363 (citing

cases from 6th, 7th, and 8th Circuits).  Factors that are appropriate for the district court to

consider when conducting a voluntariness analysis include the characteristics of the accused,

such as age, maturity, education, intelligence, and experience, and the conditions under which

the consent to search was given, such as the officer's conduct, the number of officers present,

and the duration of the encounter. *Id.* at 361-62. It is the Government's burden to show that

consent was voluntary, and that burden is "significantly heavier when [consent] follows a constitutional violation." *United States v. Miller*, 146 F.3d 274, 279 (5th Cir. 1998).

In *Boone*, the court concluded that the defendant's consent to search his home was voluntary because, *inter alia*, he was given *Miranda* warnings, *drove his own car to his home*, and signed a consent form that limited the scope of the search, indicating that he knew he had a right to refuse.  In this case, giving credit to the officers' testimony for the limited purpose of this analysis, Defendant was cooperative throughout the encounter, he was not handcuffed, no weapons were displayed, and he was told he was free to leave before Agent Crump requested his consent to accompany ICE agents to their office to prove he was not Paul Davis.  Although certainly there would have been some element of coercion by virtue of the number of officers present on the scene and the insinuation that those officers believed him to be someone else, there is no basis for the Court to conclude that the Defendant's "will was overborne" under *Schneckloth*, and thus the Court finds that the consent was voluntary, assuming that the above testimony of the officers is accepted.   But, this is not the end of the analysis, because the fruit of the poisonous tree doctrine invalidates even voluntary consents if the consent cannot be said to be "sufficiently an act of free will to purge the primary taint." *Wong Sun v. United States,* 371 U.S. 471 (1963); 4 Wayne R. LaFave, <u>Search and Seizure: A Treatise on the Fourth Amendment</u> § 8.2(d) (4th ed. 2004). *See also, e.g.*, *United States v. Jaquez*, 421 F.3d 388 (5th Cir. 2005).

### 3. *Attenuation of the Taint Inquiry*

As a general rule, evidence obtained as a result of a Fourth Amendment violation is inadmissible.  However, in *Wong Sun v. United States*, the Supreme Court noted that an

intervening "act of free will [may] purge the primary taint of the unlawful invasion." 371 U.S. 471, 486 (1963).  The Government may only use evidence obtained as a result of a constitutional violation "if the connection between the unlawful conduct and the acquisition of evidence has 'become so attenuated as to dissipate the taint.'" *United States v. Seidman*, 156 F.3d 542, 548 (4th Cir. 1998) (quoting *Nardone v. United States*, 308 U.S. 338 (1939)).

In *Brown v. Illinois*, 422 U.S. 590 (1975), the Court enumerated three factors relevant to the attenuation inquiry: (1) the amount of time between the illegal action and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. Nevertheless, "a finding with respect to attenuation . . . can only be made after consideration of all the circumstances in the case." *Seidman*, 156 F.3d at 548. The Court will examine each of the *Brown* factors in turn as applied to the facts of this case.

a) <u>Elapsed Time Between Illegal Stop and Consent</u>

The first *Brown* factor weighs in favor of suppression. Only ten to fifteen minutes elapsed between the time Defendant was initially stopped and when he was transported to the ICE office. The testimony indicates that there was an uninterrupted chain of events beginning with the traffic stop and culminating in the taking of Defendant's fingerprints.  The close temporal proximity, therefore, does not support a finding of attenuation.

b) <u>Intervening Circumstances</u>

The Government argues that there are two different intervening circumstances in this case, either of which would dissipate the taint of an illegal traffic stop. For the following reasons,

the Court disagrees, and concludes that this factor also weighs in favor of suppression.

### i) Alleged New, Distinct Crime Justifying Detention

First, the Government argues that even if the traffic stop was unlawful, the Defendant's criminal conduct *after* the stop (i.e., presenting fraudulent identification and lying to officers) constituted a new and distinct crime that was an intervening act of free will that justified further limited detention and questioning. On this point, the Government relies only on *United States v. Sprinkle,* 106 F.3d 613, 619 (4th Cir. 1997), which is inapposite to the facts of this case.

In *Sprinkle*, the court concluded that the investigative stop of defendant's vehicle was illegal because it was not supported by a reasonable and articulable suspicion that the persons in the car were engaged in criminal activity. *Sprinkle*, 106 F.3d at 618-19.  After the stop, however, while an officer was conducting a pat-down of Sprinkle, Sprinkle pushed away from the officer and ran. At some point during the ensuing chase, Sprinkle drew a gun and fired at the pursuing officer. *Id.* at 616.  When he was finally apprehended, police seized the gun, which was the evidence Sprinkle sought to suppress as a fruit of the illegal traffic stop. *Id.*  The Fourth Circuit held that Sprinkle's illegal act after the stop (firing at the officer) triggered an exception to the "fruit of the poisonous tree" doctrine, concluding that "[i]f a suspect's response to an illegal stop 'is itself a new crime, then the police constitutionally may arrest [the suspect] for that crime.'" *Id.* at 619 (quoting *United States v. Bailey*, 691 F.2d 1009, 1017 (11th Cir. 1982)).  Therefore, the court held that the gun was legally seized pursuant to a search incident to a lawful arrest. *Id.* Notably, in a footnote, the *Sprinkle* court listed five other cases in which other courts had concluded that a new and distinct crime purged the taint of initial police misconduct.  *All of them*

*involved shootings or an attempt to grab an officer's gun. Sprinkle,* 106 F.3d at 619 n.4 (citing cases from the 1st, 5th, 8th, 10th, and 11th Circuits).

Presenting a fraudulent driver's license is clearly a far cry from shooting at a police officer. In addition, it is not even clear from the record that officers would have had enough information *at that time* to arrest the Defendant for any crime based solely on the inconsistency between Defendant's appearance and the height/weight listed on his license on the one hand, and the NCIC height/weight data for John Marque Pollard on the other. In fact, Defendant was *not* arrested at the scene of the traffic stop, and Agent Crump testified that Defendant was given his license back prior to leaving the scene and that no one read him his *Miranda* rights during that portion of the encounter.

*Sprinkle* relied upon *United States v. Bailey*, in which the Eleventh Circuit explained that in cases such as this one, "the fruits doctrine generally involves a pragmatic evaluation of the extent to which the illegal police conduct caused defendant's response." *Bailey*, 691 F.2d 1009, 1013 (11th Cir. 1982). *Bailey*, in turn, cited with approval the decision in *United States v. Beck*, 602 F.2d 726 (5th Cir. 1979), in which the defendant tossed a marijuana cigarette and other drug paraphernalia out his car window after being illegally stopped by police. The *Beck* court held that the abandoned items did not provide "untainted probable cause to maintain Beck in custody, arrest the passenger, and search the car . . . (because) the abandoned contraband was itself the product of unlawful police action. . . . it would be sheer fiction to presume (the acts) were caused by anything other than the illegal stop." *Beck*, 602 F.2d at 728, 730.

In this case, the Court finds it would be "sheer fiction" to find that Defendant's presentation of fraudulent identification to police was caused by anything other than the illegal

traffic stop.  Providing one's name and license is the most fundamental element of a traffic stop.

There were absolutely no intervening circumstances, and no lapse of time between the stop and

the alleged "new crime."  In any event, "[t]he 'new crime' exception is inapplicable when the

defendant's response to the police illegality is not itself criminal but merely exposes an ongoing

crime," such as possession of an illegal substance or other contraband. 6 Wayne R. LaFave,

Search and Seizure: A Treatise on the Fourth Amendment § 11.4(j) (4th ed. 2004); *see also*

*United States v. Ramirez*, 91 F.3d 1297 (9th Cir. 1996) (firing gun into ceiling not a "new crime"

attenuating taint when defendant did not realize intruders were police officers and illegal gun

possession existed before police engaged in unlawful intrusion). Were the Court to extend

*Sprinkle* to this factual scenario, such that evidence derived from an unconstitutional stop could

in and of itself be the intervening event that purges the taint of a Fourth Amendment violation, it

would entirely eviscerate the fruit of the poisonous tree doctrine.

The Court concludes that Defendant's presentation of a fraudulent driver's license is

dramatically different in kind from the types of criminal behaviors that courts have found to

constitute intervening circumstances.  Furthermore, the presentation of the license was a direct

and inevitable result of the illegal stop, and cannot be considered untainted by the constitutional

violation.  Therefore, the Defendant's conduct after the stop did not purge the taint of the illegal

seizure.


ii) Defendant's Alleged Consent

In some circumstances, a defendant's consent may be sufficiently independent of a

constitutional violation so as to dissipate the taint. However, when courts find that to be the case,

there are generally much stronger indicia that the consent was truly an act of free will, as opposed to a product of the prior illegality.  For example, in *United States v. Seidman*, a confidential informant (CI) went to the defendant's house wearing a wire and knocked on the door about 90 times. The CI, who was a co-worker of the defendant, eventually opened the unlocked door and stepped inside without a warrant. The defendant was inside in the hallway and told the CI that he had been riding an exercise bike in the basement and hadn't heard the knocking. The defendant then led the CI to the kitchen where they proceeded to have a 45-minute conversation in which Seidman made incriminating statements. *Seidman*, 146 F.3d at 545. The Court assumed without deciding that the CI had committed an illegal entry, but held that the ensuing conversation between the men was sufficiently independent of the violation to purge any taint. *Id.* at 547.

The court found that the statements defendant made to the CI were not obtained by exploitation of the Fourth Amendment violation, stating that the entry was "at worst a minor and technical invasion of Seidman's rights." The court then proceeded to evaluate the facts under the tripartite *Brown* attenuation test, and found that the second and third factors weighed in favor of admitting the evidence. Specifically, Seidman shut the door behind the CI, motioned him into the kitchen, sat down and engaged in a conversation. The Court found that these facts constituted "independent acts of free will,"—i.e., consent to the conversation and the presence of the CI in his home—that attenuated the statements from the initial illegality. *Id.* at 549.

Conversely, in cases bearing stronger factual similarities to those presented here, many courts have concluded that a consent to search given shortly after an illegal vehicle stop is *not* an intervening circumstance that can purge the taint of the violation. In *United States v. Valdez*, 931

F.2d 1448 (11th Cir. 1991), the court found that a consent to search a vehicle was tainted by an illegal pretextual stop and detention, where the consent was requested "immediately after requesting to see Valdez's drivers license," even though the defendant was informed that he had the right not to consent. *Valdez,* 931 F.2d at 1452. The court noted that the conduct of the police was "certainly not ... flagrantly unconstitutional," but that the officer had no reason connected with the traffic stop itself to request permission to search the car. *Id.* Thus, the consent remained tainted. *See also, e.g., United States v. Jaquez*, 421 F.3d 338, 342 (5th Cir. 2005) (consent to search car given after illegal traffic stop not sufficiently an act of free will to break causal chain of events flowing from constitutional violation, given close temporal proximity between stop and consent and lack of any material intervening circumstances between the stop and the consent).

In support of its argument on this point, the Government points the Court to *United States v. Calhoun*, 49 F.3d 231 (6th Cir. 1995), and *United States v. Liss*, 103 F.3d 617 (7th Cir. 1997). In *Calhoun*, the defendant signed for a controlled delivery of a package containing drugs and was arrested. Police then conducted an illegal "sweep" of her apartment in violation of the Fourth Amendment. After receiving *Miranda* rights, the defendant was presented with a consent form to allow police to search her apartment. She signed the form, did not request an attorney, and agreed to answer questions. *Calhoun*, 49 F.3d at 233-34. Although the sweep did not uncover evidence, the defendant contended it was instrumental in causing her to consent to the later search and make the statements she sought to suppress. The government contended that the consent provided an independent source for seizure of the evidence because they were not obtained on the basis of any information garnered during illegal search. The court agreed with the government, and permitted the introduction of the statements. However, the court conducted

only a voluntariness analysis and failed to analyze the defendant's consent under the fruit of the poisonous tree doctrine. Therefore, the decision is against the overwhelming weight of authority in this area, and this Court declines to follow it.

*Liss* is even further afield from prevailing law in this area.  In that case, police conducted an illegal search of the defendant's barn, finding marijuana and other contraband. They then requested that the defendant give written consent to further search the property, which he did. 103 F.3d at 619.  Liss later argued that the search pursuant to his written consent was invalid because it was tainted by the prior search. *Id.* The court of appeals framed the issue as "whether the fact that the police were motivated to request consent to search his house because of what they found illegally in the barn renders the written consent invalid as an exploitation of the illegal barn search." *Id.* at 621.  Inexplicably, the court found that it did not, stating that "a non-custodial voluntary consent should be seen as an independent intervening event behind which we will not probe for improper motivation and which thus serves as a break in any causal chain stemming from an illegal search." *Id.* at 621-22.

The concurring opinion in *Liss* categorized the majority's holding as a "frontal assault on the precedents of the Supreme Court of the United States and this court. . . . A voluntary consent . . . standing alone, does not purge the evidence of the taint of an antecedent illegal search." *Id.* at 622 (Ripple, J., concurring).  Judge Ripple went on to note that the Tenth Circuit had "experimented" with the rule propounded by the majority in *United States v. Carson*, 793 F.2d 1141 (10th Cir. 1986), but that it had subsequently abandoned the approach in *United States v. Melendez-Garcia*, 28 F.3d 1046 (10th Cir. 1994), which held that "not only must the government show that consent is voluntary in fact, but it must also demonstrate a break in the causal

connection between the illegality and the consent, so that the court will be satisfied that the consent was 'sufficiently an act of free will to purge the primary taint.'" 28 F.3d at 1054. In addition, the *Liss* majority limited its holding to consents given following illegal *searches,* not those following illegal *seizures* like the traffic stop in the present case.

Therefore, as with *Calhoun*, the Court concludes that *Liss* is against the weight of authority in this area, and quite possibly inconsistent with Supreme Court precedent, and declines to follow it.

In this case, the Court finds that there was no break in the causal chain of events between the illegal stop and Defendant's alleged consent to be fingerprinted.  Therefore, his alleged consent was tainted by the violation, and cannot serve as an intervening circumstance that would permit the admission of evidence obtained thereafter.

c) Purpose and Flagrancy of Official Misconduct.

The Court finds that the final *Brown* factor also weighs in favor of suppressing the evidence in this case. The only conclusion the Court may draw based on the evidence presented is that police stopped Defendant's vehicle without probable cause, most likely because they wanted to ascertain his identity.  Though this behavior does not seem outrageous or patently offensive, a finding of "'purposeful and flagrant' misconduct is not limited to situations where the police act in an outright threatening or coercive manner similar to what occurred in *Brown.*" *United States v. Reed*, 349 F.3d 457, 465 (7th Cir. 2003). In fact, in *Brown,* the Supreme Court noted that the defendant's  "arrest without probable cause had a 'quality of purposefulness' in that it was an 'expedition for evidence' admittedly undertaken in the hope that something might

turn up." *Brown* at 605.  In *Reed*, the Seventh Circuit held that:

> Without probable cause to believe that a crime has been committed, the police may not simply seize a person and hope that over time and after 'reflection' the person decides to cooperate. . . . Therefore, in addition to examining whether the officer's actions were coercive or calculated to cause surprise, fright or confusion, the district court also must examine whether the actions were undertaken *in an effort to advance the investigation* or to *embark on a fishing expedition in the hopes that it would lead to a confession or other useful evidence*. Such actions would undermine the purpose of the Fourth Amendment, and therefore are relevant to this analysis that ultimately examines whether suppression is necessary for purposes of deterrence or judicial integrity.

*Reed*, 349 F.3d at 465-66 (emphasis added); *accord United States v. Miller*, 146 F.3d 274, 280

(5th Cir. 1998) ("With respect to the flagrancy factor, while more egregious violations of Fourth

Amendment rights are possible, the type of violation here–stopping suspect without probable

cause– is the sort of police behavior that the *Brown* . . . test is meant to discourage.").

The Government argued at the hearing that the evidentiary deficiencies in this case were

likely due to inadvertent omissions or sloppy record-keeping by law enforcement rather than an

overt flouting of the Fourth Amendment, and therefore the third factor should weigh in favor of

admitting the evidence.  In essence, this would require the Court to find that, in spite of its

conclusion that the Government has not met its burden of establishing probable cause for the

traffic stop, there was, in actuality, probable cause for the stop that just could not be

demonstrated on the record three years after the fact.  This is a leap of logic that the Court

cannot, and will not, make.

Furthermore, even if the Court were to find that the officer's conduct in stopping

Defendant's car was not a flagrant or purposeful Fourth Amendment violation, this would not

change the outcome because "the lack of such misconduct is of no moment because there was no

intervening event to break the connection to the initial arrest." *United States v. Ienco*, 182 F.3d 517, 528 (7th Cir. 1999). Thus, the Court would still find suppression warranted based on the first and second factors only.

## IV. CONCLUSION

This Court does not make its decision in this matter lightly. The application of the exclusionary rule, which was conceived for the purpose of protecting individual rights guaranteed under our Constitution, is in another sense contrary to the public interest, in that it prevents a jury from considering relevant, probative evidence, and in circumstances such as this one, may allow the guilty to escape prosecution entirely.  The Court recognizes that "suppression is not an automatic consequence of a Fourth Amendment violation" and that the "question turns on the culpability of the police and the potential to deter wrongful police conduct." *Herring v. United States*, 129 S. Ct. 695, 697 (2009).  However, suppression is here amply justified; this is not a case of "isolated negligence" and, even if it were, it is certainly not "attenuated" from the illegal traffic stop. *Id.* Moreover, there would be a very real threat to the efficacy of the Fourth Amendment's prohibition of unreasonable seizures if the reasonableness of a seizure were to turn on a purported pretext as fundamentally unsupported as the one in this case. To rule otherwise would be to give an open invitation to the wholesale stopping of motorists under the flimsiest of pretexts, something that simply cannot be tolerated under our Constitution.  In short, stops lacking any real pretext must be deterred, lest police misconduct become the order of the day. This, after all, is the very purpose of the exclusionary rule.

Therefore, the Court will **GRANT** the Defendant's motions to suppress statements and tangible and derivative evidence flowing from the illegal traffic stop by separate Order.

Date: March 10, 2009

_____/s/_____
Roger W. Titus
United States District Judge